NOTICE
Decision filed 07/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240354-U

NO. 5-24-0354

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| MITCHELL/ROBERTS PARTNERSHIP, an Illinois General Partnership; REBA L. MITCHELL, Trustee and Beneficiary of the Robert H. Mitchell Residual Trust; CARL INMAN, Independent Executor of the Estate of Russell J. Inman, Deceased; CAROL DEAN CRABTREE; NELDA BALDWIN, Personal Representative of the Estate of Beverly B. Adams, Deceased; NELDA BALDWIN, Personal Representative of the Estate of Katherine Baldwin, Deceased; DAVID SENSENEY, Executor of the Estate of Margueritte Boos, Deceased; and CEDAR CREST MINERALS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Williamson County. |
| Plaintiffs-Appellants and Counterclaim Defendants, | ) ) | |
| v. | ) ) ) | No. 14-MR-285 |
| WILLIAMSON ENERGY, LLC, a Delaware Limited Liability Company, | ) ) ) ) | |
| Defendant-Appellee and Counterclaim Plaintiff | ) ) | |
| (Robin Lynne Kee Williams and John Milo Kee, Counterclaim Defendants). | ) ) ) ) | Honorable Jeffrey A. Goffinet, Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm the circuit court's award of summary judgment in favor of counterclaim plaintiff where (1) counterclaim was not barred by judicial estoppel; (2) reorganized debtor had standing; (3) no error in establishing judicial admissions was shown; (4) mitigation agreements and releases signed by partners bound the partnership; (5) no abuse of discretion in allowing counterclaim plaintiff to amend its counterclaim

1

to include the partners individually was shown; (6) no error in denying motions for clarification and reconsideration was shown; (7) counterclaim defendant was not denied right to a trial; and (8) no abuse of discretion in award of attorney fees was shown.

¶ 2    The appellants, Mitchell/Roberts Partnership, an Illinois general partnership, Reba L. Mitchell, trustee and beneficiary of the Robert H. Mitchell Residual Trust, Carl Inman, independent executor of the estate of Russell J. Inman, deceased, Carol Dean Crabtree, Nelda Baldwin, personal representative of the estate of Beverly B. Adams, deceased, Nelda Baldwin, personal representative of the estate of Katherine Baldwin, deceased, David Senseney, executor of the estate of Margueritte Boos, deceased, and Cedar Crest Minerals, LLC (collectively, the Partnership), appeal the following orders: the circuit court's grant of summary judgment in favor of appellee Williamson Energy, LLC, and against the Partnership dated February 9, 2024; the order awarding attorney fees to Williamson Energy in the amount of $2,929,814.28; the order granting Williamson Energy's bill of costs; the order denying the Partnership's motion to reconsider; the order denying the Partnership's motion for clarification; the order granting summary judgment in favor of Williamson Energy dated September 14, 2023; the order establishing judicial admissions; a portion of the order dated July 21, 2022, striking paragraphs 6, 7, 9, and 10 of Robin Kee Williams' affidavit; the order denying the Partnership's combined motion to dismiss Williamson Energy's second amended counterclaim pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)) as to counts I and II via docket entry dated March 1, 2022; and the entirety of the order resolving the Partnership's motion to dismiss, including, but not limited to, those portions of said order which denied its section 2-619 motion for dismissal. The Partnership requests that the circuit court's orders be reversed; that said summary judgment and orders be vacated; and the case be remanded to the circuit court with directions to enter judgment

2

in their favor, or, in the alternative, that said judgment and orders be reversed and the case be remanded for a trial on all issues.

¶ 3    This appeal involves two mitigation agreements and releases signed by Robin Lynne Kee Williams and John Milo Kee (siblings who are collectively referred to as "the Kees" and counterclaim defendants in the action filed by Williamson Energy). The Kees were general partners in the Partnership at the time they signed the documents. The circuit court concluded these agreements waived all claims for subsidence damage arising from Williamson Energy's mining operations. At summary judgment, the circuit court found the Partnership and the partners had breached the agreements by filing suit on claims they had waived. The circuit court also found that under the agreements, Williamson Energy was entitled to attorney fees. After a hearing to determine reasonable attorney fees, the circuit court entered judgment in favor of Williamson Energy in the amount of $2,929,814.28. The Partnership, and all the partners except the Kees, appeal both the grant of summary judgment and the award of fees. The Partnership posits two claims of error: (1) the circuit court erred in granting summary judgment in favor of Williamson Energy, and (2) the circuit court abused its discretion in awarding $2,929,814.28 in attorney fees. For the reasons that follow, we affirm.

¶ 4                            I. BACKGROUND

¶ 5    This is the Partnership's second appeal to this court. See *Mitchell/Roberts Partnership v. Williamson Energy, LLC*, 2020 IL App (5th) 190339. The original lawsuit began in 2014 with the Partnership's affirmative claims regarding Williamson Energy's rights to mine coal. The Kees were party to the original suit and subsequent appeal. The claims in the first appeal hinged on the construction of 100-year-old deeds known as "the Pierce Deeds" which were divided into Pierce

3

Deeds A, B, C, D, and E. We find the following excerpts from the first appeal to be helpful in the instant matter:

"A. Mineral Deeds

The Pierce Deeds at issue in this appeal are mineral deeds. In Illinois, common law and statutory law establish that mineral rights may be severed and owned separately from the surface land. A real estate owner may either convey by deed or reserve title to any minerals existing beneath the surface of the real estate. To that regard, the Illinois Supreme Court in *Manning v. Frazier*, 96 Ill. 279, 283-85 (1880), recognized that minerals under the soil are real estate and, as such, are capable of conveyance by deed. Likewise, section 1(a) of the Severed Mineral Interest Act (Act) defines a severed mineral interest as 'any whole or fractional interest in any or all minerals which have been severed from the surface estate by grant, exception, reservation or other means.' 765 ILCS 515/1(a) (West 2016).

B. Subsidence

Section 1(c) of the Act defines a surface owner as 'any person or entity vested with a whole or undivided fee simple interest or other freehold interest in the surface estate overlying a severed mineral interest.' *Id.* § 1(c). The surface owner is, as a matter of law, entitled to subjacent support from the owner of the subjacent mineral interest. *Lloyd v. Catlin Coal Co.*, 210 Ill. 460, 468 (1904). 'This right of support is absolute and without condition ***.' *Id.* However, '[l]ike any other right, the owner of the surface may part with the right to support, by his deed or covenant.' *Wesley v. Chicago, Wilmington & Franklin Coal Co.*, 221 Ill. App. 427, 433 (1920) (quoting *Williams v. Hay*, 14 A. 379 (1888)). The surface owner

4

may also agree in the deed 'to waive and release all damages caused by the loss of subjacent support.' *Mason v. Peabody Coal Co.*, 320 Ill. App. 350, 352-53 (1943). However, such agreements are strictly construed 'and the courts will not find that there has been a waiver or release of the right of subjacent support unless the intention to give such a waiver or release clearly appears either by express words or by necessary implication from the language used. *Id.* at 353.

\* \* \*

A. Parties

Plaintiff Mitchell/Roberts alleges that coal exists above the depth of 125 feet from the surface of the parcels described in the Pierce Deeds (Shallow Coal) and claims ownership of the same, as the successor in interest to grantors George S. Roberts and May Roberts. The individually named plaintiffs are the individual owners of Mitchell/Roberts and allege, in the alternative, that they are the successors in interest to the grantors and have, through two partnership agreements executed in January and March 2015, conveyed their individual interests to Mitchell/Roberts." *Mitchell/Roberts Partnership*, 2020 IL App (5th) 190339, ¶¶ 7-10, 31-32.

¶ 6    The issue in the first appeal was whether the Pierce Deeds conveyed subsidence rights to all 127 parcels described in the deeds (as Williamson Energy argued) or to only a handful of the parcels (as the Partnership and its partners argued). In the initial case, the circuit court granted summary judgment in favor of Williamson Energy, holding the Pierce Deeds, including Parcel No. 68 at issue in the instant case, unambiguously conveyed subsidence rights to all 127 parcels. On appeal, this court affirmed, and that portion of the case is resolved and final.

5

¶ 7    Following the first appeal, the parties litigated Williamson Energy's second amended counterclaim which sought judgment against the Partnership and the individual partners, including the Kees. This counterclaim hinged on the construction of two mitigation agreements between Williamson Energy and the Kees, who had signed the agreements. The mitigation agreements waived and released claims related to subsidence damage. But the Kees and the Partnership ultimately brought the claims they had expressly waived and released, which the circuit court found implicated the attorney fee provisions contained in the mitigation agreements and releases. The circuit court also found that the attorney fee provisions had been made applicable to all the parcels covered in the Pierce Deeds.

¶ 8    On August 17, 2022, attorneys for the Kees filed a motion to withdraw as counsel, representing to the court that their withdrawal was necessary because the Kees wished to retain alternate counsel to represent them to ensure their personal interests in the litigation. The Kees ultimately were represented by new counsel.

¶ 9    Williamson Energy sought to have certain facts established by judicial admission. The circuit court found some, but not all, of the statements were judicial admissions. After the ruling by the circuit court, Williamson Energy sought summary judgment, which was granted. Finally, the circuit court held an evidentiary hearing on Williamson Energy's request for attorney fees and awarded judgment in the amount of $2,929,814.28.

¶ 10                    A. The Pierce Deeds, Including Parcel 68

¶ 11   In the early 1900s, Thomas M. Mitchell and George S. Roberts formed a partnership engaged in the acquisition and sale of various interests in real estate, coal, and other minerals. That partnership became known as the Mitchell/Roberts Partnership. Relevant to this appeal, in 1913, Mr. Roberts, acting on behalf of the Partnership, acquired land in fee to property referred to as

6

Parcel 68. On March 13, 1913, he conveyed the coal lying below the depth of 125 feet (the Deep Coal) in Parcel 68 and the other 82 parcels in Pierce Deed A to Charles Pierce. He retained, on the Partnership's behalf, all other property interests not conveyed. The Kees were identified as heirs of Roberts.

¶ 12                    B. Williamson Energy Negotiates With the Kees

¶ 13    On July 7, 2005, Williamson Energy obtained Permit No. 375 in order to longwall mine the Deep Coal within the Pond Creek Mine located in Williamson County, Illinois. Williamson Energy subsequently invested more than $612 million in property, equipment, leases, and other capital to develop and operate the mine. The longwall method extracts the entire coal seam, leaving behind a void that causes the ceiling of the mine to collapse, resulting in subsidence to the earth and surface above.

¶ 14    The Kees owned lands overlying the Deep Coal within the mine plan. In 2010, Williamson Energy contacted the Kees to discuss mining and reclamation operations planned to occur on two properties they owned. The two contiguous properties fell within the boundaries of Parcel 68. Unbeknownst to Williamson Energy at the time of the discussions, the Kees were general partners of the Partnership.

¶ 15    Over the course of several months, the parties repeatedly discussed the planned mining operations, the terms of the mitigation agreements that would govern the parties' rights and responsibilities as to those mining operations, and the consideration Williamson Energy would pay the Kees under the agreements. The parties met twice at the food court of the local mall and had multiple meetings at Ms. Williams' home, sometimes with Mr. Kee participating by telephone.

¶ 16    In connection with the negotiations, Williamson Energy retained Cullen & Associates, Inc., an independent third-party appraisal company, to appraise the structures and improvements on the

7

properties. The appraisal company prepared two statements of actual cash value for the structures on the property—one for $57,975.60 for the property owned solely in Ms. Williams' name, and the other for $67,603.10 for the property owned in both Kees' names.

¶ 17    Because the Kees were not satisfied with these figures, negotiations continued. Williams Energy ultimately increased its offer as to each property, offering to pay $76,754.38 (instead of $57,975.60) for the property owned solely in Ms. Williams' name, and $99,673.25 (instead of $67,603.10) for the property owned in both Kees' names. These increased figures included separate $10,000 signing bonuses.

¶ 18    In July 2010, Williamson Energy delivered an offer letter and mitigation agreement for each property to the Kees. The mitigation agreements signed by the Kees identified them as the "Surface Owner[s]." Each agreement included the following language: "This proposal will remain open for 5 days." At her deposition, Ms. Williams testified that she felt she had to sign the mitigation agreements "then and there," but she also testified that she understood she had five days to consider the offers before signing them. At his deposition, Mr. Kee testified that he was pressured into signing the mitigation agreements, but he also testified that he believed the negotiations with Williamson Energy were fair and that the consideration he and his sister received was fair.

¶ 19                    C. The Kees Sign the Mitigation Agreements

¶ 20    The Kees accepted Williamson Energy's revised offers. The relevant portion of paragraph 6(g) of the mitigation agreements signed by the Kees set forth a release of claims and damages as follows:

>    "Upon [Williamson Energy's] making payment to [the Kees] pursuant to
>
>    this Section, [the Kees] forever and fully release [Williamson Energy] from any

8

and all claims, demands, causes of action, damages, costs and expenses that [the Kees] may incur arising from or out of [Williamson Energy's] mining operations associated with the coal underlying the Property, [the parties] expressly agree that such payment shall satisfy [Williamson Energy's] obligation under [the Surface Coal Mining Land Conservation & Reclamation Act] SCMLCRA to correct material Damage caused by subsidence; that such payment shall constitute a final and binding remedy for any such Damage; and that [the Kees'] release of [Williamson Energy] is binding on [the Kees'] heirs, successors and assigns and shall be a covenant running with the land."

¶ 21    Paragraph 6(h) of the mitigation agreements provided, "At closing or at the time of final payment, [the Kees] shall execute such other form of release as [Williamson Energy] may require." In addition to the release, paragraph 11 included a transfer of subsidence rights and waiver of damages as follows:

"[The Kees] acknowledge that [Williamson Energy] has certain mining rights which permit the mining of coal underlying the Property, and this Agreement shall act and serve as a quit-claim conveyance or transfer by [the Kees] to [Williamson Energy] of the right to subside the surface of the Property *** and of the right to subside the surface of the Property without liability to [the Kees] (except as provided for in this Agreement) for any and all damages to the surface or subsurface or anything thereon or therein for surface or subsurface subsidence caused by mining out the coal ***."

¶ 22    Paragraph 11 of the mitigation agreements included a "New Surface" clause that provided:

"If [the Kees] or [their] agent, or anyone acting on behalf of [the Kees] or for [their] benefit, acquires any surface land or surface property within the boundary of Permit #375 as such boundary exists at the time of such acquisition during the term of this Agreement ('New Surface'), the Parties agree that the New Surface shall be and become part of the Property (and thereby become subject to this Agreement)."

Paragraph 14 of the mitigation agreements also included a provision permitting a court to award attorney fees to the successful litigant in any dispute concerning the subjects covered by the agreements.

¶ 23            D. The Kees Attend Closings for the Mitigation Agreements

¶ 24    On September 3, 2010, the Kees attended a real estate closing with Williamson Energy at a local title company. At the closing, the Kees executed a release of all claims in accordance with paragraph 6(h) of the mitigation agreements. The release was recorded on September 3, 2010, in the Williamson County Recorder's Office. The release provided that, as to the properties in question, the Kees "release and forever discharge" Williamson Energy from "all claims, *** causes of action, and liability arising from" Williamson Energy's "coal mining operations."

¶ 25    On January 19, 2011, Ms. Williams attended a second real estate closing at the title company. There, she executed a similar release recorded that same day in the Williamson County Recorder's Office. Williamson Energy paid the Kees, collectively, $176,427 as consideration for the two sets of mitigation agreements and releases. As noted above, the lands subject to those agreements are part of Parcel 68.

10

¶ 26                                    E. Mining Begins

¶ 27    In the fall of 2013, Williamson Energy began its longwall mining operations under the Kees' properties. The Kees did not object to Williamson Energy's mining operations, and Williamson Energy reimbursed Ms. Williams $932.93 for meals and provided her and her family hotel accommodations for 10 days during its operations. The manufactured homes and structures on the properties—for which Williamson Energy had paid more than full cash value, as if they had been entirely destroyed—suffered nominal damage.

¶ 28          F. The Partnership Makes Claims Premised on the Pierce Deeds

¶ 29    On July 25, 2014, Attorney Bill Bonan sent a letter to Williamson Energy stating that his clients, the Inman Estate and the Mitchell Trust, owned thousands of acres of minerals within Williamson Energy's mine plan. He demanded that Williamson Energy produce titles showing it had authority to subside the surface on these properties. Shortly thereafter, the estate and trust wrote individual letters demanding that Williamson Energy stop all mining activities on "our properties" or pay them $15,000 per acre for the right to subside plus "all damages."

¶ 30    On October 9, 2014, Williamson Energy responded with a detailed summary of its title and right to subside. A short time after, Mr. Bonan wrote Williamson Energy again, claiming "our investigation confirms [Williamson Energy] did not acquire the right to subside the surface or overlying strata of the lands owned, acquired, [or] retained in various instruments and deeds by our clients and described in your letter." In a follow-up letter, for the first time, these attorneys identified the Partnership as the actual owner and the estate and trust as partners. The Partnership requested a meeting to negotiate a settlement over the property disputes. That meeting occurred on November 19, 2014. The Partnership's attorneys requested a royalty of around 4% to 5% per ton of coal mined—around $18,000 per acre mined or $181 million total. Williamson Energy's

11

attorneys followed up on November 24, 2014, by offering to pay $100,000 as a settlement. The Partnership never responded.

¶ 31          G. The Partnership and Partners Sue Williamson Energy

¶ 32    On November 26, 2014, the Partnership filed a verified complaint against Williamson Energy, alleging, *inter alia*, it owned the Shallow Coal with full rights of subjacent support overlying the Deep Coal within the Pond Creek Mine and that Williamson Energy had no right to operate its longwall mine since longwall mining was certain to cause subsidence to the Shallow Coal, thus violating the Partnership's right of subjacent support. Count I sought "a declaration of rights involving the legal construction of provisions in the Pierce Deeds pertaining to the conveyance of subsidence rights. Count II sought to quiet title to the subjacent and sublateral support of the Shallow Coal and sought to permanently enjoin any further removal of such subjacent and sublateral support from the parcels described in the Pierce Deeds. Count III alleged unjust enrichment resulting from the trespass and removal of subjacent support from the parcels." *Mitchell/Roberts Partnership*, 2020 IL App (5th) 190339, ¶ 35.

¶ 33    On December 31, 2014, Williamson Energy filed a motion to dismiss the verified complaint, alleging the Partnership lacked standing as it did not own any property within the mining plan. Williamson Energy maintained that because the partners owned the coal in their own names, whatever coal they retained via the Pierce Deeds was their individual property, not partnership property. In response, the Partnership acknowledged that the Pierce Deeds were executed by Roberts as agent for the Partnership which was not disclosed by the deeds.

¶ 34    Relevant to this appeal, the Kees were specifically identified as partners in the Partnership's second amended complaint filed on June 15, 2016. Other partners were added in subsequent amended complaints. In the amended complaints, additional counts were added on

12

behalf of the individually named partners because Williamson Energy challenged the existence of the Partnership. See *id.* In its motion to dismiss, Williamson Energy argued that the Partnership lacked standing to bring claims for declaratory relief, quiet title, and unjust enrichment where it failed to establish that the Partnership had any interest in the coal estate created by the Pierce Deeds. Alternatively, Williamson Energy argued that even assuming a partnership had an interest in the coal referenced in the Pierce Deeds, the death of George. S. Roberts in 1934 dissolved the partnership.

¶ 35    The Partnership filed a rebuttal to the motion to dismiss and, in support thereof, attached as an exhibit "Articles of Agreement" dated April 15, 1939, of record in Misc. Book 41, page 519 (Williamson County), which was recorded five years after the death of George S. Roberts. The 1939 agreement was executed by the widow and sole heir of George S. Roberts, deceased, on one part, and Henry Mitchell and Ruth Mitchell Deeds, the sole heirs of Thomas M. Mitchell, deceased, which chronicled the partnership of Mitchell and Roberts. The Partnership pointed out that the 1939 agreement noted the respective estates of Roberts and Mitchell contained a description of lands and real estate interests owned by such parties separate and apart from the partnership land. The Partnership insisted that the 1939 agreement made it clear that the partnership existed even after the deaths of Mitchell and Roberts. As evidence that the Partnership continued after the 1934 death of George S. Roberts, the Partnership also attached as an exhibit a "Stipulation" dated October 23, 1984, which was recorded in Misc. Book 176, page 321 (Williamson County). The 1984 document was signed by George M. Roberts, 50 years after the death of George S. Roberts.

¶ 36    The Partnership and its partners specifically verified that the Partnership owned full rights of subjacent and sublateral support parcels of land, including Parcel 68. More particularly, the Partnership and partners verified that Roberts had obtained the properties at issue in the Pierce

13

Deeds on the Partnership's behalf, that the Partnership had retained all interests not conveyed in the Pierce Deeds (*i.e.*, everything Roberts acquired except the Deep Coal conveyed to Mr. Pierce), and that the Partnership still retained those interests.

¶ 37                    H. The Partners Enter Into Partnership Agreements

¶ 38    After filing the lawsuit against Williamson Energy, the partners entered into a partnership agreement on January 16, 2015. In the partnership agreement, the partners noted that while there had been no formal, written partnership agreement between Mitchell and Roberts, such partnership existed and "engaged in the acquisition and sale of various interests in real estate, coal and other minerals" in the surrounding counties. The document stated that Mitchell died in 1914, while Roberts died in 1934. The partnership agreement stated that despite the death of the founding partners, "the Partnership was continued by and among the heirs and devisees of the deceased partners as confirmed by an agreement dated April 15, 1939." The partners, including the Kees, "certif[ied], ratif[ied], stipulate[d] and confirm[ed]" that they were the legal owners of "all assets owned or claimed by the Partnership," and that these assets included the "right, title and interest of the Mitchell/Roberts Partnership *** wherever located, and in any form or structure of ownership, without limitation." The partnership agreement also defined which partners were authorized to act on behalf of the Partnership. The agreement expressly provided:

> "Any act taken by any partner regarding any waiver of the right to subjacent
> support of the surface or conveyance of said right or anything done outside of or
> contrary to the allegations or claims set out in the complaint filed against
> Williamson Energy, LLC is not approved as being a Partnership act or as approved
> by the Partnership and is specifically disclaimed."

14

¶ 39    In March 2015, the partners entered into a second partnership agreement. There, the Kees agreed to convey their ownership interest in all Partnership property held in their names (*i.e.*, Parcel 68) into the Partnership in exchange for a combined 6.25% partnership interest. The other partners likewise conveyed property they owned in their names into the Partnership in exchange for *pro rata* interests in the Partnership.

¶ 40    In the second partnership agreement, the Partnership once again referenced the 1939 document titled "Articles of Agreement," which had been entered into by and between May Roberts and George M. Roberts, on one part, and Henry Mitchell and Ruth M. Deeds, on the other part. The Partnership stated that the 1939 Agreement recited (1) the original Partnership between George S. Roberts and Thomas M. Mitchell; (2) that from time to time title to the Partnership ownership of coal and other minerals was taken in the name of one or the other partners or in the name of both partners; (3) that the Partnership lands excluded the lands and interests individually owned by George S. Roberts and Thomas M. Mitchell, as contained in the inventory of their respective estates; and (4) the various interests in the Partnership real estate was owned in an undivided one-half by May Roberts and George M. Roberts, and an undivided one-half by Henry Mitchell and Ruth M. Deeds.

¶ 41                    I. The Individual Partners Join the Lawsuit

¶ 42    The Partnership filed a first amended complaint on June 10, 2015. They again included Parcel 68 as one of the parcels owned by the Partnership. On December 3, 2015, Ms. Williams was deposed and testified as follows:

> "Q. You understand that? The plaintiff is the Mitchell/Roberts Partnership?
>
> A. Right.
>
> Q. You're a partner?

15

A. Yes.

Q. Your brother John is a partner?

A. Yes.

\*\*\*

Q. So your testimony is that the coal that Williamson Energy mined [on Parcel 68 of Pierce Deed A] was the property of the partnership?

A. Any land that I own is going to be the partnership.

Q. But do you own all the coal underneath your land?

A. I don't know. The partnership does.

Q. You're confident that the partnership owns all the coal—

A. Yes.

Q. —at all depths—

A. Yes.

Q. —underneath your land?

A. Yes."

¶ 43    On February 26, 2016, Williamson Energy filed a counterclaim alleging that the Partnership and the individual partners' prosecution of the action breached the mitigation agreements and associated releases. On June 15, 2016, the Partnership filed a verified second amended complaint. The partners, including the Kees, were joined as additional plaintiffs and asserted their own claims in the alternative against Williamson Energy. Parcel 68 was again one of the parcels subject to their claims. Williamson Energy refiled its counterclaim each time it filed an answer to a subsequent amended complaint.

16

¶ 44    In December 2016, a hearing was held on the Partnership's motion to dismiss the counterclaim which was subsequently denied by the circuit court. On September 5, 2017, the Partnership and the partners filed a verified third amended complaint, again including Parcel 68 as Partnership property. After extensive discovery and motion practice, the circuit court granted summary judgment in favor of Williamson Energy on July 15, 2019, as to the Partnership's and partners' affirmative claims, finding that the Pierce Deeds conveyed subsidence rights to Williamson Energy's predecessor in all parcels described in the Pierce Deeds. The circuit court did not rule on Williamson Energy's counterclaims at that time.

¶ 45                          J. The Partnership's First Appeal

¶ 46    A few days later, on July 18, 2019, Williamson Energy offered to settle all disputes with the Partnership and the partners, including the Kees, on walk-away terms. Williamson Energy would dismiss its counterclaims with prejudice if the Partnership would forgo an appeal. The Partnership did not respond to this offer, instead seeking an order from the circuit court that there was no just reason to delay an appeal on their claims. The circuit court granted the Partnership's request to appeal. On September 8, 2020, this court affirmed the circuit court's judgment. See *Mitchell/Roberts Partnership*, 2020 IL App (5th) 190339, ¶ 103. The Partnership thereafter sought leave to appeal to the Illinois Supreme Court, which denied their request and remanded the case on January 27, 2021.

¶ 47                   K. Williamson Energy Files for Bankruptcy

¶ 48    On March 10, 2020, during the pendency of the appeal, Williamson Energy and 30 affiliated debtors (Debtors) commenced bankruptcy proceedings under Title 11 of the United States Code (the Bankruptcy Code). On March 30, 2020, the Partnership, through counsel, filed

17

entries of appearance in the bankruptcy proceedings as an unsecured claimant. As a result, the Partnership received all notices and disclosures filed by Williamson Energy.

¶ 49 On April 9, 2020, the Debtors, including Williamson Energy, filed their disclosure statement for Joint Chapter 11 Plan of Reorganization. The disclosure statement provided that the debtors would reorganize as the reorganized debtors, who would retain all rights to all causes of action and that all causes of action shall vest in the reorganized debtors. The bankruptcy court subsequently entered a disclosure statement order approving the disclosure statement, which provided: "The Disclosure Statement, including its exhibits, contains adequate information such that holders of Claims entitled to vote on the Plan *** can make informed decisions as to whether to vote to accept or reject the Plan in satisfaction of the requirements of Bankruptcy Rule 3017(d) and in accordance with section 1125(a)(1) of the Bankruptcy Code."

¶ 50 On April 13, 2020, each of the debtors, including Williamson Energy, filed their respective schedules of assets and liabilities and statements of financial affairs, which they refiled on April 28, 2020. There, Williamson Energy expressly reserved all rights to all causes of action as follows:

"Causes of Action. Despite their commercially reasonable efforts to identify all known assets, the Debtors may not have listed all of their causes of action or potential causes of action against third-parties as assets in the Schedules and Statements, including, without limitation, causes of actions arising under chapter 5 of the Bankruptcy Code and any other relevant non-bankruptcy laws to recover assets or avoid transfers. The Debtors reserve all of their rights with respect to any cause of action (including avoidance actions), *** *counterclaim* *** whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law ( collectively, 'Causes of Action') they may

18

have, and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any claims or Causes of Action or in any way prejudice or impair the assertion of such claims or Causes of Action." (Emphasis added.)

¶ 51 On May 20, 2020, Williamson Energy and the other Debtors filed their consolidated Chapter 11 Plan, which they subsequently amended with a plan supplement. In its disclosure statement for the second amended reorganization plan, Williamson Energy provided:

"Preservation of Causes of Action. In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, unless expressly stated otherwise in the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable,

19

expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court."

¶ 52    On May 26, 2020, the Partnership filed a general unsecured claim and an administrative expense claim in the amount of $899,604,300 against Williamson Energy related to the same claims the circuit court had already decided against them. Williamson Energy opposed those claims, and the bankruptcy court subsequently rejected them in their entirety on May 21, 2021.

¶ 53    On June 24, 2020, the bankruptcy court confirmed the Debtors' Chapter 11 Plan, which became effective on June 30, 2020, whereupon the Debtors successfully emerged from Chapter 11 as the reorganized debtors. The confirmed Chapter 11 Plan, the approved Disclosure Statement, the Chapter 11 Plan Supplement, the Debtors' original Chapter 11 Plan, the disclosure statement for the original Chapter 11 Plan, the first amended Chapter 11 Plan, and the disclosure statement

for the first amended Chapter 11 Plan all provided that "the Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan" and "therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation of the Plan."

¶ 54    Each of the statements, schedules, confirmation order, plan, disclosure statement, and disclosure statement order was served on the Partnership's and the partners' then-shared counsel. Neither the Partnership nor the partners objected to the Chapter 11 Plan's confirmation. Neither appealed the confirmation order nor sought to have the confirmation order set aside.

¶ 55                    L. Williamson Energy Amends Its Counterclaims

¶ 56    Once the case was remanded to the circuit court, Williamson Energy sought leave to amend its counterclaim to add the individual partners. In its second amended counterclaim, Williamson Energy alleged two counts of breach of contract and one count seeking injunctive relief. In count I, Williamson Energy alleged, *inter alia*, that the mitigation agreements signed by the Kees identified them as the owners of the surface land overlying the Deep Coal within the mine plan; that the releases signed by the Kees released Williamson Energy from any and all claims arising from its coal mining operations and corresponding damages; that the Kees entered into the mitigation agreements and releases for good and valuable consideration, transferring to Williamson Energy via quitclaim all rights to subsidence and releasing Williamson Energy from all claims, damages, causes of action, and liability relating to its mining operations on their properties; that it fully performed its obligations under the mitigation agreements and releases and satisfied all conditions precedent thereunder, including paying the Kees all amounts owed in

21

connection with the mitigation agreements and releases; that because the Kees were general partners in the Partnership when they signed the mitigation agreements and releases, the Partnership and each of the partners became bound when the Kees executed these documents; that the Partnership and individual partners subsequently filed suit against Williamson Energy seeking injunctive relief and damages for the Kees' properties in breach of the express terms of the mitigation agreements and releases; and that the mitigation agreements signed by the Kees contained a provision that allowed the court to award reasonable attorney fees to the recovering party in the event of litigation.

¶ 57    In count II, Williamson Energy alleged, *inter alia*, that the mitigation agreements signed by the Kees provided that if the Kees, or their agents, or anyone acting on their behalf or for their benefit, acquired any surface property within the Pond Creek Mine, such property "shall be and become part of the Property (and thereby become subject to this Agreement)"; that by operation of the second partnership agreement, the Kees conveyed their properties to the Partnership in exchange for a 6.25% ownership interest extending to all Partnership property within the Pond Creek Mine; that via operation of the second partnership agreement, all Partnership property within the Pond Creek Mine became subject to the mitigation agreements and releases, including the waivers and releases relating to its mining operations; that the Partnership and partners' multi-year suit seeking hundreds of millions in damages and the closure of the Pond Creek Mine based upon Williamson Energy's mining operations was a direct violation of the terms and conditions of the mitigation agreements and releases; and that the mitigation agreements signed by the Kees contained a provision that allowed the court to award reasonable attorney fees to the recovering party in the event of litigation.

¶ 58    Several months later, the Partnership claimed for the first time that it had never owned an interest in Parcel 68 after all. Approximately a year later, after additional discovery and motion practice, the attorneys for the Partnership filed a motion to withdraw as counsel for the Kees. As a result, the Kees obtained separate counsel, which necessitated additional discovery and depositions.

¶ 59    On April 12, 2023, Williamson Energy filed a motion to deem facts judicially admitted. The motion was based on verified allegations, exhibits incorporated into those verified allegations, and testimony. The Partnership's primary response—later incorporated by the Kees—was that the facts were not judicial admissions because they were made in previous litigation, not in the current proceeding being tried. The circuit court rejected this argument, and the Partnership has abandoned this argument on appeal.

¶ 60    The circuit court granted Williamson Energy's motion and held that 15 statements were judicial admissions. Williamson Energy then incorporated those 15 statements, and other undisputed material facts, into a motion for partial summary judgment. The motion included all the undisputed facts in separately numbered paragraphs, underlining the judicial admissions. The Partnership advanced a series of legal arguments against summary judgment but did not present evidence to establish a dispute of material fact. Nor did the Partnership present a response to the separately numbered paragraphs in Williamson Energy's statement of material facts. On September 14, 2023, the circuit court granted summary judgment in favor of Williamson Energy as to liability. The circuit court made the following factual findings:

> "The area which is at issue in this matter is Parcel 68 of the Pierce deeds. That property was conveyed to George S. Roberts in 1913 for and on behalf of [the Partnership]. Williamson Energy Statement of Facts Para. 1-3 26. Williamson

23

[Energy] had obtained Permit #375 to mine under Parcel 68 and other adjacent areas.

Robin L. Williams and John Milo Key are general partners on [the Partnership]. In March of 2015, all of the Counter-Defendants executed a partnership agreement which provided (1) the property they owned would be transferred to the partnership in exchange for a percentage ownership of the partnership; (2) confirmation and ratification of actions taken by a partner to conserve/protect the partnership assets; and (3) confirmation that the partnership had existed uninterrupted.

Williams and Key, for consideration, signed a Mitigation Agreement on July 14, 2010[,] with Williamson Energy, LLC. A copy is attached hereto as Exhibit 1. Paragraphs 11 and 14 are of importance. Paragraph 11 provides 'If Surface Owner, or Surface Owner's agent, or anyone acting on behalf of Surface Owner or for Surface Owner's benefit, acquires any surface land or surface property within the boundary of Permit #375 as such boundary exists at the time of such acquisition during the term of this agreement ("New Surface"), the Parties agree that the new surface shall be and become part of the Property (and thereby become subject to this Agreement).' Paragraph 14 provides that in the event of any litigation between Williamson [Energy] and the Kees relating to or arising from the mitigation agreement, the prevailing party shall be entitled to reasonable attorney fees.

The [Partnership] Complaint related to the property detailed in the Mitigation Agreement. Williamson [Energy] was the prevailing party in that case."

¶ 61    Thereafter, Williamson Energy filed a petition for attorney fees. The circuit court allowed the Partnership and the partners, including the Kees, to conduct written discovery and depositions before holding an evidentiary hearing. The circuit court reviewed the claims made by Williamson Energy as well as the Partnership's and partners' objections. The court noted that Williamson Energy's lawyers were "highly skilled and clearly knowledgeable as to mineral law"; that the case "represented a significant and complex claim" and was not "a common lawsuit"; and that it involved "challenging issues" and "a monetary value in the realm of $900,000,000." Based on all these factors, the circuit court held that the attorneys' rates were "reasonable." Even so, the circuit court reduced the amount of attorney fees requested by capping paralegal rates; cutting by 20% all of the hours submitted by one firm based on block-billing and vague time entries; and eliminating fees for clerical time and duplicative work. On February 9, 2025, the circuit court entered summary judgment in favor of Williamson Energy, which disposed of all remaining claims, and awarded it attorney fees in the amount of $2,929,814.28 as the prevailing party under the fee-shifting provision in the mitigation agreements.

¶ 62    The Partnership filed a timely appeal. The Kees, still represented by separate counsel, did not file an appeal nor have they joined this appeal.

¶ 63                                    II. ANALYSIS

¶ 64    The Partnership argues the circuit court erred in granting summary judgment in favor of Williamson Energy. They maintain that (1) Williamson Energy's counterclaim was barred by judicial estoppel; (2) the reorganized Williamson Energy lacked standing; (3) the circuit court erred in entering its order establishing judicial admissions; (4) the mitigation agreements and releases signed by the Kees did not bind the Partnership; (5) the circuit court erred in denying its motions for clarification and reconsideration; (6) the circuit court abused its discretion in allowing

25

Williamson Energy to amend its counterclaim to include the partners individually; and (7) the circuit court denied the Partnership its right to a trial. The Partnership next argues that the circuit court abused its discretion in awarding $2,929,814.28 in attorney fees. They maintain that the attorney fees clause is not binding on the Partnership or the partners and that the circuit court erred in allowing nearly $1,398,000 in block-billed time. The Partnership maintains the circuit court erred in rejecting their objections to the attorney fees regarding entries which were made without meaningful descriptions, unallowable travel time, irrelevant projects, and excessive billing rates.

¶ 65    Conversely, Williamson Energy maintains the Partnership presented no evidence to dispute the facts supporting its request for summary judgment. Nor did they present any evidence when opposing Williamson Energy's motion to deem certain facts judicially admitted. Instead, in response to both motions, the Partnership made a series of legal arguments regarding standing, judicial estoppel, contract interpretation, and other matters.

¶ 66                                A. Summary Judgment

¶ 67    " 'Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Mitchell/Roberts Partnership*, 2020 IL App (5th) 190339, ¶ 43 (quoting *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005)). However, summary judgment is a drastic means of disposing of litigation. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007); *Belknap v. Crawford*, 2024 IL App (4th) 230679, ¶ 17. Before a trial court grants summary judgment, the movant must establish that its right to summary judgment is clear and free from doubt. *Belknap*, 2024 IL App (4th) 230679, ¶ 17.

26

¶ 68    Once the moving party satisfies its initial burden to present evidence of undisputed material facts, the burden is on the *nonmoving party* "to establish that there are genuine issues of material fact." *Performance Food Group Co. v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 18. To survive a motion for summary judgment, a nonmoving party must come forward with evidentiary material that establishes a genuine issue of material fact. *Hotze v. Daleiden*, 229 Ill. App. 3d 301, 305 (1992). While the nonmovant need not prove its case, it must set forth some facts that would arguably entitle it to prevail. *Diaz v. Home Federal Savings & Loan Ass'n of Elgin*, 337 Ill. App. 3d 722, 725 (2002).

¶ 69    The appellate court reviews a grant of summary judgment *de novo. Council for Jewish Elderly v. Kurtz*, 2024 IL App (1st) 230102, ¶ 33. *De novo* consideration means a reviewing court performs the same analysis that a circuit court would perform. *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529, ¶ 102. A reviewing court may affirm on any basis appearing in the record, whether or not the circuit court relied on that basis or whether its reasoning was correct. *Id.* ¶ 104.

¶ 70                                    1. Judicial Estoppel

¶ 71    Initially, the Partnership maintains that Williamson Energy's counterclaim was barred by judicial estoppel where Williamson Energy failed to list the counterclaim as an asset in its bankruptcy schedules. "In the bankruptcy context, a party may be judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). Under the Bankruptcy Code, a debtor must file "a schedule of assets and liabilities." 11 U.S.C. § 521(1) (2024). "[A] cause of action is an asset that must be scheduled under section 521(a)(1) of the Bankruptcy Code (11 U.S.C. § 521(a)(1) (2006)) ***." *Holland v.*

27

*Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 118. A debtor may choose to retain a cause of action for postconfirmation enforcement in its bankruptcy plan. *In re Kmart Corp.*, 310 B.R. 107, 119 (Bkrtcy N.D. Ill 2004). Section 1123 sets out the contents required in a Chapter 11 bankruptcy plan and states that a plan may provide for:

> "(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

> (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest[.]" 11 U.S.C. § 1123(b)(3) (2024).

¶ 72    However, this section does not indicate what particular language or degree of specificity is required to preserve a claim or, as relevant here, a cause of action. See *Johns v. Eastman Chemical Co.*, 248 F. Supp. 3d 765, 768-69 (S.D.W. Va. 2017). "Courts are divided on how a section 1123(b)(3) retention provision must be written in order to accomplish the desired result, *i.e.*, retention of a cause of action for later adjudication and enforcement." *In re Kmart Corp.*, 310 B.R. at 120. Although generally courts agree that a blanket reservation of "all claims" is insufficient to preserve a claim, some courts have found general reservations by "type" or "category" of claim is sufficiently specific. *Johns*, 248 F. Supp. 3d at 769. "The purpose of the provision is to 'put creditors on notice of any claim [the debtor] wishes to pursue after confirmation and enable creditors to determine whether the proposed [p]lan resolves matters satisfactorily before they vote to approve it.' " *Id.* (quoting *In re Texas Wyoming Drilling, Inc.*, 647 F.3d 547, 550 (5th Cir. 2011)).

¶ 73    "Judicial estoppel is an equitable doctrine that may be invoked when a litigant took a position in one judicial proceeding, benefited from that position, and then seeks to assert a contrary

position in a later proceeding." *Muhammad v. Abbott Laboratories, Inc.*, 2022 IL App (1st) 210478, ¶ 24. The Illinois Supreme Court "has identified five prerequisites as 'generally required' before a court may invoke the doctrine of judicial estoppel." *Seymour v. Collins*, 2015 IL 118432, ¶ 37. "The party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it." *Id.* "[I]f all prerequisites have been established, the trial court must determine whether to apply judicial estoppel ***." *Id.* ¶ 47. "Multiple factors may inform the court's decision, among them the significance or impact of the party's action in the first proceeding and, as noted, whether there was an intent to deceive or mislead, as opposed to the prior position having been the result of inadvertence or mistake." *Id.* Where a circuit court has exercised its discretion in the application of judicial estoppel, we review for abuse of discretion. *Id.* ¶ 48.[1]

¶ 74    Here, the Partnership argues that Williamson Energy should be judicially estopped from asserting its counterclaim, maintaining that the counterclaim is inconsistent with Williamson Energy's earlier position in the bankruptcy proceedings that it possessed no such claim. In doing so, it argues, Williamson Energy took two factually inconsistent positions in separate judicial proceedings from which it received a benefit. The Partnership further argues that Williamson Energy cannot credibly claim the omission was inadvertent since the counterclaim already had been filed when Williamson Energy omitted it from its schedules. The Partnership posits that given

---

[1]We note that where the circuit court's exercise of its discretion results in the termination of the litigation via a motion for summary judgment, we review that ruling *de novo. Seymour*, 2015 IL 118432, ¶ 49. However, because the termination of the litigation via a motion for summary judgment did not result from the circuit court's exercise of its discretion regarding its application of judicial estoppel, we will review for an abuse of discretion.

the mandatory nature of the disclosure requirements in bankruptcy proceedings, this court should apply judicial estoppel.

¶ 75  We find the Partnership's argument without merit. Neither section 521 nor section 1123 of the Bankruptcy Code require debtors to "specifically list" each independent cause of action. Williamson Energy repeatedly expressed its intent in the bankruptcy action to retain its interest in the counterclaim when it listed and reserved the types of causes of actions to be retained in its schedules, disclosure statements, and reorganization plan. Accordingly, we reject the argument that Williamson Energy took two factually inconsistent positions in separate judicial proceedings.

¶ 76  Assuming, *arguendo*, this court agreed that Williamson Energy failed to disclose the counterclaim as an asset in its bankruptcy schedules, the Partnership's argument still fails. Even where a circuit court finds all five factors present, it must exercise its discretion in deciding whether to apply judicial estoppel. *Seymour*, 2015 IL 118432, ¶ 47. A circuit court's decision may be informed by multiple factors, including the significance or impact of the party's action in the first proceeding and whether the party intended to deceive or mislead, as opposed to inadvertently or mistakenly taking the prior position. *Id.* Most notably, the question of whether a party intended to deceive or mislead is a "critical factor" in deciding whether to apply judicial estoppel. *Id.* ¶ 54.

¶ 77  In *Seymour*, 2015 IL 118432, the plaintiffs filed a personal injury cause of action while the bankruptcy was pending. In determining whether to apply judicial estoppel, the Illinois Supreme Court began with the assumption that the plaintiffs were under a legal duty to disclose their personal injury cause of action as an asset in the bankruptcy proceeding and determined that they failed to do so. *Id.* ¶ 53. Nevertheless, our supreme court found no evidence that the plaintiffs intended to deceive or mislead the bankruptcy court. *Id.* ¶ 59.

¶ 78    Under the facts presented here, we similarly find there was no evidence that Williamson energy intended to deceive or mislead the bankruptcy court. The counterclaim was pending as of the date of the reorganization plan, and the parties had been actively engaged in litigation for seven years. Williamson Energy expressly listed and reserved the types of causes of actions, including the counterclaim, to be retained in its schedules, disclosure statements, and reorganization plan. Accordingly, we find that Williamson Energy is not judicially estopped from bringing its counterclaim.

¶ 79                              2. Standing

¶ 80    We reject the Partnership's next argument that the reorganized Williamson Energy lacked standing to assert its counterclaim as the Partnership's argument is premised on the fact that Williamson Energy did not schedule its counterclaim, an argument we rejected. Williamson Energy's disclosure statement provided that the debtors would reorganize as "Reorganized Debtors," retaining all rights to all causes of action and that all causes of action shall vest in the reorganized debtors. "Chapter 11 of the Bankruptcy Code enables a debtor company to reorganize its business under a court-approved plan governing the distribution of assets to creditors." *U.S. Bank National Ass'n v. Village at Lakeridge, LLC*, 583 U.S. 387, 389 (2018). With regard to a Chapter 11 bankruptcy: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b) (2024). *Cusano v. Klein*, 264 F.3d 936, 945 (9th Cir. 2001). As the bankruptcy statute does not contain language requiring ongoing litigation to be identified specifically, we conclude that reorganized Williamson Energy had standing, following confirmation of its plan, to pursue its counterclaim against the Partnership.

31

¶ 81                                    3. Judicial Admissions

¶ 82    The Partnership maintains the circuit court erred in finding that 6 of the 16 statements submitted by Williamson Energy were judicial admissions.[2] It further maintains that because the circuit court's erroneous rulings on the alleged judicial admissions were crucial to its decision to grant summary judgment in favor of Williamson Energy, this court should reverse the circuit court's judgment. Williamson Energy counters that many of the admissions were made by the Partnership in their verified pleadings, exhibits, and deposition testimony.

¶ 83    Judicial admissions withdraw a fact from issue and dispense "wholly with the need for proof of the fact." *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 557-58 (2005). A judicial admission conclusively binds a party. *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998). "Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *Id.*; see also *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011). Once made by a party, a judicial admission may not be contradicted in a motion for summary judgment or at trial. *In re Estate of Rennick*, 181 Ill. 2d at 406.

¶ 84    For a statement to qualify as a judicial admission, it "must not be a matter of opinion, estimate, appearance, inference, or uncertain summary." *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 468 (2009). The determination as to whether a statement constitutes a judicial admission must be decided under the circumstances in each case. *Id*. Before a statement can be held to be an admission, it must be given a meaning consistent with the context in which it was found and in relation to the other testimony and evidence presented. *Id*.

---

[2]Although the Partnership claims the circuit court erred in finding statement No. 2 to be a judicial admission, on appeal it failed to make an argument or cite legal authority in support thereof, and, thus, the claim is waived. See *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 207 (2007) ("Mere contentions, without argument or citation of authority, do not merit consideration on appeal and are waived.").

32

¶ 85     Admissions of a party in a verified pleading are judicial admissions. *Yarc v. American Hospital Supply Corp.*, 17 Ill. App. 3d 667, 670 (1974); see also *Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 23 (finding that judicial admissions may be made in exhibits attached to a verified pleading). A verified pleading remains part of the record despite any later amendments to the pleadings, and any admissions made therein that are not the product of mistake or inadvertence become binding judicial admissions. *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 45. Additionally, testimony at a discovery deposition may constitute judicial admissions. *In re Estate of Rennick*, 181 Ill. 2d at 407. For testimony to be binding as a judicial admission, it must be peculiarly within the knowledge of the deponent. *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 482 (1987). "[A]ssertions made in a deposition constitute binding judicial admissions only if they are unequivocal." *Id*. at 480.

¶ 86     We recognize there is a split of authority among districts regarding the appropriate standard of review to apply when analyzing whether a circuit court should have treated a statement as a judicial admission. Some appellate court districts apply a *de novo* standard of review while other districts ask whether the circuit court abused its discretion. See *Crittenden*, 2012 IL App (1st) 112437, ¶ 46, and *Hall v. Cipolla*, 2018 IL App (4th) 170664, ¶ 101 (compiling various cases). However, the cases advocating for either standard of review agree on the same basic framework to apply in determining whether to deem a statement a judicial admission. Thus, a case applying the abuse of discretion standard still requires the statement to be "clear, unequivocal, and uniquely within the party's personal knowledge" (*In re Estate of Rennick*, 181 Ill. 2d at 406), and a case applying *de novo* review similarly looks at the context of the statement (*Herman v. Power*

33

*Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 361 (2009)). We need not decide that question here, as our conclusion would remain the same under either standard.

¶ 87    The circuit court found the following statements to be judicial admissions: "Statement 1. George S. Roberts owned the property known as Parcel 68 in fee and on behalf of the Partnership immediately prior to the execution of the Pierce deeds" and "Statement 3. George S. Roberts retained, for and on behalf of the Partnership, all other property interest in Parcel 68 that he did not convey [via] Pierce Deed A." The Partnership maintains the alleged admissions involve ownership of real estate interests which is a question of law, not of fact, and thus is not an appropriate judicial admission. In support of its argument, the Partnership cites two cases: *Charles v. Lasher*, 20 Ill. App. 36, 40 (1886) ("ownership of property is a question of law to be determined by the finding of certain facts"), and *Matson v. Ripley*, 70 Ill. App. 86, 88 (1897) ("Ownership is not a fact, but is a legal conclusion to be drawn by the court from facts to be found by the jury."). However, these cases can be distinguished as in each, the jury received improper instructions and was left to determine the ownership of certain property. Here, the circuit court was not tasked with determining whether Roberts owned the property at issue but whether the Partnership admitted that he did.

¶ 88    In its original verified complaint, the Partnership verified, under oath, that "[t]he coal in and underlying 127 parcels of land in Williamson County, Illinois, more particularly described in the [Pierce D]eeds *** was owned by George S. Roberts, as agent for the Partnership, immediately prior to the execution of the [Pierce D]eeds." The Partnership attached as an exhibit Pierce Deed A to the original verified complaint, making the exhibit part of the verified pleading. Pierce Deed A included a legal description of Parcel 68 and identified a warranty deed for that land showing that Roberts had acquired Parcel 68 in fee nine days before he conveyed the Deep Coal to Pierce.

34

The Partnership repeatedly affirmed these admissions in subsequent verified pleadings as well as in the attached exhibits such as the partnership agreements later signed by the partners.

¶ 89     In the first partnership agreement, each partner agreed that all property retained by Roberts was and remained partnership property. Specifically, they affirmed that Roberts had acquired real estate in Williamson County on the Partnership's behalf and that this property had not only remained Partnership property but also that the partners were the legal owners of "[a]ll right, title and interest of the Mitchell/Roberts Partnership or the assets claimed or owned by Thomas Mitchell and/or George S. Roberts on behalf of the Partnership, and wherever located, and in any form or structure of ownership, without limitation." Under either standard of review, the statements are judicial admissions binding on the Partnership.

¶ 90     The circuit court found the following statement to be a judicial admission: "Statement 5. John Milo Kee and Robin Lynne Kee Williams are (A) general partners of the Partnership and (B) have been since birth." We note the circuit court declined to find clause 5(B) of the statement to be a judicial admission as to Mr. Kee, but did find it so as to Ms. Williams. The Partnership argues that a determination as to whether Ms. Williams was a partner "since birth" raises a legal conclusion incapable of being a judicial admission. We disagree. At the outset we note that the Partnership did not assert that Ms. Williams' testimony was the product of mistake or inadvertence. See *Crittenden*, 2012 IL App (1st) 112437, ¶ 45.

¶ 91     Review of the record reveals that Ms. Williams testified in her deposition that she had been a partner in the Partnership since the day she was born. Ms. Williams' unequivocal (and uncontroverted) deposition statement that she had been a general partner of the Partnership since her birth was certainly within her knowledge although she was uncertain whether there were any documents that reflected her partnership from birth. The fact that Ms. Williams had no such

documentation is of no consequence considering the Partnership had existed since the early 1900s without a written partnership agreement. It was not until January 2015, after filing its lawsuit against Williamson Energy, that the Partnership entered into two partnership agreements wherein it reconfirmed the ownership interests of the partners, limited the scope of the partners' authority to act on behalf of the Partnership, and sought to disclaim, after the fact, the acts taken by the Kees in signing the mitigation agreements and releases.

¶ 92    Written partnership agreements are not necessary because a partnership may exist under a verbal agreement. *Laroia v. Reuben*, 137 Ill. App. 3d 942, 946 (1985). Under section 103 of the Uniform Partnership Act (Act), relations among and between partners and the partnership are governed by the partnership agreement with certain exceptions not relevant here. 805 ILCS 206/103(a) (West 2022). Moreover, the Act governs the parties only to the extent that the partnership agreement does not otherwise provide. *Id.* Woven throughout the Partnership's arguments on appeal is the notion that the 2015 partnership agreements governed the parties' course of conduct at the time the Kees signed the mitigation agreements and releases. However, the terms of the written partnership agreements conflict with evidence in the record regarding the ordinary course of conduct carried out by the partners prior to 2015 which did not include a limitation on the scope of the partners' authority to act on behalf of the Partnership.

¶ 93    Setting aside clause 5(b), we find the statement that the Kees were general partners of the Partnership was a judicial admission. In its verified complaint, the Partnership asserted that "[t]he current partners of the Partnership, who include, without limitation, the heirs, successors and assigns of George S. Roberts and his wife, May Roberts," were identified in the first partnership agreement attached as an exhibit. In the exhibit, the Kees, who had signed the partnership agreement, were identified as partners. In subsequent amended verified complaints, the Partnership

36

asserted that "[t]he individual Plaintiffs include all the heirs, devisees, successors and assigns of George S. Roberts, deceased, and the widow of George S. Roberts, May Roberts, deceased, as more fully appears" in the second partnership agreement attached to those pleadings as an exhibit. In the second partnership agreement, which contained the Kees' notarized signatures, the Kees were identified as heirs of Roberts and as partners to the agreement. Moreover, in her deposition, Ms. Williams testified that at the time she signed the mitigation agreements, she was a general partner of the Partnership. Thus, the Partnership's and Ms. Williams' deliberate, clear, and unequivocal statement that the Kees were general partners to the Partnership was a judicial admission.

¶ 94    The circuit court found the following statement to be a judicial admission: "Statement 11. The lands subject to the First and Second Mitigation Agreements are part of Parcel 68." The Partnership argues the statement is a legal conclusion and a matter not within the Partnership's unique knowledge. Conversely, Williamson Energy argues that the Partnership made this judicial admission in its verified answer to the original counterclaim when the Partnership admitted the allegations contained in paragraph 12, which read: "The Williams Property and Kee Property are situated within the legal description of Parcel 68 of Pierce Deed A." We do not agree that the statement is a legal conclusion or a matter not within the Partnership's unique knowledge. The first and second mitigation agreements, signed by the Kees, each have a legal description of the real property establishing that the lands at issue are part of Parcel 68. Under either standard of review, we find the statement was a judicial admission.

¶ 95    The circuit court found the following statements were judicial admissions:

"Statement 14. In the First Partnership Agreement, the Partners ratified and confirmed that 'all of the acts of the Partners whether shown or called individual

37

acts relating to the Partnership property of whatever kind or nature were done for the Partnership and on behalf of the Partners, and such acts are hereby ratified and confirmed herein.' "

and

"Statement 16. In the Second Partnership Agreement, Robin Williams and John Kee agreed that they would no longer own their interest in Parcel 68 in their own names but rather would convey that interest to the Partnership so that it would now own these properties in its own name. In exchange, Robin Williams and John Kee received a combined 6.25% partnership interest."

¶ 96 The Partnership's claim of error regarding their statements is that the circuit court summarized the contents of certain partnership agreements, omitting material terms. The Partnership contends that this action was patently improper and did not meet the elements of judicial admissions. The Partnership then referred this court to two pages from earlier sections of its brief. It is unclear to this court what specific argument the Partnership was referencing as to this issue and, thus, we find the argument forfeited. See *Prakash v. Parulekar*, 2020 IL App (1st) 191819, ¶ 36 ("a reviewing court is not a repository into which a party may dump the burden of argument or research, and the failure to support an argument with pertinent authority results in forfeiture of the argument").

¶ 97 Reviewed in their context, we find the statements at issue to be clear, unequivocal, and uniquely within the Partnership and the partners' personal knowledge. We do not find the statements were the product of mistake or inadvertence. Accordingly, we find the statements constituted binding judicial admissions.

¶ 98    We agree with the circuit court's findings that the following statements, upon which it relied in granting the motion for summary judgment, also constituted binding judicial admissions:

"Statement 2: On March 13, 1913, George S. Roberts conveyed the coal lying below the depth of 125 feet (the 'Deep Coal') in Parcel 68 to Charles Pierce via Pierce Deed A.

Statement 6: On July 14, 2010, Robin Williams entered into a mitigation agreement with Williamson Energy for lands described on Ex. A to that agreement (the 'First Mitigation Agreement').

Statement 7: (A) The First Mitigation Agreement identifies Ms. Williams as the surface owner of these lands.

Statement 8: On July 14, 2010, Robin Williams and John Kee entered into a Second Mitigation Agreement with Williamson Energy for the lands described on Ex. A to that Agreement.

Statement 9: (A) The Second Mitigation Agreement identifies Robin Williams and John Kee as the surface owners of these lands.

Statement 10: Neither Robin Williams nor John Kee told Williamson Energy that any partnership, let alone the Partnership, owned the lands described in the First and Second Mitigation Agreements during the negotiations of these agreements.

Statement 12: On November 24, 2014, the Partnership filed a verified Complaint against Williamson Energy, which was subsequently amended to include the Partners as additional Plaintiffs, verifying that the Partnership owned

39

the Shallow Coal and further claiming that it owned full rights of subjacent and sublateral support in Parcel 68.

Statement 13: On January 16, 2015, Robin Williams, John Kee, Reba Mitchell, as trustee of the Robert H. Mitchell Residual Trust, Carl Inman, as executor of the Estate of Russell J. Inman, and Carol Crabtree entered into the First Partnership Agreement.

Statement 15: In March 2015, the Partners entered into the Second Partnership Agreement.

Statement 16: (A) In the Second Partnership Agreement, Robin Williams and John Kee agreed that they would no longer own their interest in Parcel 68 in their own names but rather would convey that interest to the Partnership so that it would now own these properties in its own name. (B) In exchange, Robin Williams and John Kee received a combined 6.25% partnership interest."

¶ 99                4. The Mitigation Agreements and Releases

¶ 100   The Partnership argues that the mitigation agreements and releases did not bind the Partnership because (1) the Kees did not sign on behalf of the Partnership; (2) the Kees did not acquire portions of all of the Partnership's real estate; (3) the Kees' property was not owned by the Partnership after 1939; and (4) the mitigation agreements were unconscionable.

¶ 101   The crux of the Partnership's first argument that the Kees, who did not join this appeal, did not sign the documents on behalf of the Partnership is that there was no language in the mitigation agreements or releases that indicated the Kees were acting in a partnership capacity and, further, that Williamson Energy admitted there was no disclosure of partnership capacity when these documents were negotiated and signed by the Kees. While true, this does not end our analysis.

40

¶ 102   Although negotiations with the Kees began in late 2009, review of the record reveals it is possible that Williamson Energy did not learn that the Kees were partners until June 15, 2016, when the Partnership filed its second amended complaint specifically identifying them as partners. That said, this argument contradicts Ms. Williams' testimony that she signed both mitigation agreements, which set forth the release of claims and damages, as a general partner of the Partnership and that, although the surface was titled in her name, the Partnership owned both the surface and coal relating to these properties.

¶ 103   Section 301 of the Act provides:

"(1) Each partner is an agent of the partnership for the purpose of its business. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received a notification that the partner lacked authority.

(2) An act of a partner which is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners." 805 ILCS 206/301 (West 2022).

¶ 104   We agree with William Energy's contention that the issue is not whether the mitigation agreements or releases mention the partnership but, rather, whether the Kees conducted an act which was "for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership" such that they bound the Partnership when they signed the mitigation

agreements and releases. Here, review of the record reveals that from its very inception the Partnership's business was the acquisition and sale of various interests in real estate, coal, and other minerals. Furthermore, the verified pleadings, deposition testimony, and partnership agreements demonstrate that the partners owned properties in their own names for the benefit of the Partnership and were permitted to take all actions related to these properties. Nevertheless, the Partnership now attempts to distance themselves from the actions of the Kees, who were general partners in the Partnership.

¶ 105    The Partnership maintains there is no evidence to suggest that, given the language of the releases, the Kees contemplated the releases covered the rights or properties of the Partnership. Nor, they argue, did the releases purport to apply to any properties other than those owned by the Kees in their own names at the time they signed the documents.

¶ 106    Releases are governed by contract law. *Construction Systems, Inc. v. FagelHaber, LLC*, 2015 IL App (1st) 141700, ¶ 25. Where the terms of the release are clear and explicit, the court must enforce it as written, and the construction of the release is a question of law. *Id*. A release, which is strictly construed against the benefiting party, must spell out the intention of the parties with great particularity. *Id*. The scope and effect of a release is controlled by the intention of the parties. *Id*. A reviewing court may examine the circumstances surrounding the execution of the release to determine the parties' intent to determine whether a release was fairly made and accurately reflects the parties' intentions. *Id*. ¶ 26.

¶ 107    The clear and unambiguous language of the releases reveals the parties' intention was to discharge Williamson Energy from any and all claims potentially arising from its mining operations of the coal underlying the property held by the Kees in exchange for payment. The

express language also reveals the parties intended the released would be binding on the Kees' heirs, successors, and assigns. Thus, we find this argument to be without merit.

¶ 108   The Partnership's next argument is that the Kees did not acquire portions of all of the Partnership's real estate. The Partnership posits that a premise for Williamson Energy's counterclaim was that under the 2015 partnership agreements, the Kees acquired a portion of all of the Partnership's real estate, thus, triggering the New Surface clause. It goes on to argue that the New Surface clause failed to extend the mitigation agreements to the Partnership's other real estate because there was no valid deed; neither the Kees nor the Partnership obtained a "new" surface after 2010; and Williamson Energy was never required to prove what, if any, specific additional surface land purportedly was acquired by the Kees or the Partnership.

¶ 109   In response, Williamson Energy contends that the New Surface clause was not limited to the Kees acquiring additional property since it also was triggered if anyone acquired property in the mine plan for the benefit of the Kees. In the first appeal, the individual partners alleged that they were successors in interest to the grantors and had, through two partnership agreements executed in 2015, conveyed their individual interests to the Partnership. See *Mitchell/Roberts Partnership*, 2020 IL App (5th) 190339, ¶ 32. Here, the benefit the Kees and the other partners received when they conveyed their individual interests to the Partnership allowed them to prosecute their claims against Williamson Energy. For the Kees, the benefit was a 6.25% interest in the Partnership. The Partnership anticipated a $900 million recovery against Williamson Energy, resulting in a potential benefit of $54 million to the Kees, thereby triggering the express language of the New Surface clause.

¶ 110   The Partnership next argues that the Kees' property was not owned by the Partnership after 1939; thus, the Partnership was not subject to the mitigation agreements. It contends that in 1939,

43

the heirs of Mitchell and Roberts determined which properties would be included in, and excluded from, the Partnership's holdings and that the Kees' properties were expressly excluded from its holdings. However, this interpretation of the 1939 agreement conflicts with the Partnership's verified pleadings, testimony, and partnership documents.

¶ 111 Throughout the course of lengthy litigation, the Partnership at all times stated it owned Parcel 68, which included the Kees' properties. When the Kees joined as parties to the litigation, they were identified as partners by the Partnership. At no time did the Partnership indicate that the Kees' properties had been excluded as Partnership property in the 1939 agreement. In her deposition, Ms. Williams explicitly stated that any land she owned was partnership land. Finally, in the first partnership agreement, the partners certified, ratified, stipulated, and confirmed that they were the legal owners of "all assets owned or claimed by the Partnership," and that these assets included:

> "All right, title and interest of the Mitchell/Roberts Partnership or the assets
>
> claimed or owned by Thomas M. Mitchell and/or George S. Roberts on behalf of
>
> the Partnership, and wherever located, *and in any form or structure of ownership,*
>
> *without limitation*." (Emphasis added.)

At the time the partners entered into the first partnership agreement, the Kees' property, like all the Partnership properties at issue in the lawsuit, appeared to have been owned by the individual partners in their own names. However, the partnership agreement established that these properties were, in fact, owned by the Partnership, regardless how they were titled.

¶ 112 The second partnership agreement recites that Roberts acquired property on behalf of the Partnership in the early 1900s and that, in 1913 and 1914, he conveyed via the Pierce Deeds a portion of that Partnership property (*i.e.*, the Deep Coal) concerning 127 parcels to Pierce. The

44

second partnership agreement further provided that all property Roberts owned that was not conveyed in the Pierce Deeds was and *remained* Partnership property. At the time of the Pierce Deeds, Roberts owned Parcel 68 of Pierce Deed A in fee. Thus, according to the second partnership agreement, after Roberts conveyed the Deep Coal to Pierce, he still retained on behalf of the Partnership all the remaining property in Parcel 68, from the surface to the depth of 125 feet, and such property (which includes the Kees' properties) has been continuously owned by the Partnership since 1913.

¶ 113   Accordingly, we reject the Partnership's argument that the Kees' property was not owned by the Partnership after 1939. The Mitchell/Roberts Partnership had existed since the early 1900s, engaging in the acquisition and sale of various interests in real estate, coal, and other minerals. Following the death of the founding partners, the Partnership was continued by and among the heirs and devisees of the deceased partners, which included the Kees. As partners, the Kees had authority to bind the Partnership when they signed the mitigation agreements and releases as the subject matter of the documents was essential in the furtherance of the Partnership's business, namely, the acquisition and sale of various interests in real estate, coal, and other minerals.

¶ 114                              5. Unconscionability Claim

¶ 115   The Partnership argues that the mitigation agreements were both procedurally and substantively unconscionable. "Unconscionability takes two general forms; an agreement may be unenforceable if it is either procedurally or substantively unconscionable." *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 60 (2011). An unconscionability analysis requires a court to determine whether the agreement, by its formation or by its terms, is so unfair that the court cannot enforce it consistent with the interests of justice. *Id*. A circuit court's determination of whether a contract

45

or a portion of a contract is unconscionable is a question of law which is reviewed *de novo. Timmerman v. Grain Exchange, LLC*, 394 Ill. App. 3d 189, 193 (2009).

¶ 116                              a. Procedural Unconscionability

¶ 117   Procedural unconscionability involves some impropriety during the process of forming the contract which deprived a party of meaningful choice. *Phoenix Insurance Co.*, 242 Ill. 2d at 60. "Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Id.* Procedural unconscionability arises where a contract term is so difficult to locate, read, or understand that a party cannot fairly be said to have been aware of agreeing to it, and it also takes into account a lack of bargaining power. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006).

¶ 118   The Partnership posits that the mitigation agreements were procedurally unconscionable because although the mitigation agreements were designed to lead the Kees to believe they were contracting for mitigation for subsidence damage caused to the "structures" and "surface" of the land, on one occasion, Williamson Energy inserted the word "subsurface" into paragraph 11 in an attempt to expand the waiver of liability to the subsurface of the property. Further compounding the inclusion of the word "subsurface," it argues, is the fact that Williamson Energy did not capitalize the word "damages" in that paragraph when the word had been capitalized throughout the document. The premise of the Partnership's argument is that the Kees, as lay persons, should be protected from enforcement of the liability waiver clause which was "deceptively included in the agreement." Throughout its argument on this issue, the Partnership repeatedly refers to the Kees as lay people who entered into a contract with a sophisticated commercial business. We find

46

this argument unpersuasive as the Partnership fails to point to any evidence in the record establishing that the Kees were unsophisticated lay people such that they were unable to understand the terms of the agreement. See *Razor*, 222 Ill. 2d at 100. Moreover, reviewing the record, we do not find evidence that important terms in the mitigation agreements were hidden in fine print or difficult to locate and read. See *id.*; *Phoenix Insurance Co.*, 242 Ill. 2d at 60.

¶ 119   The Partnership argues there was evidence of nontextual procedural irregularities as well. It maintains the Kees testified in their depositions they were pressured into signing the mitigation agreements and were given only five days to review them. This argument belies the fact that the mitigation agreements were the product of several months of negotiation between the Kees and Williamson Energy. Williamson Energy entered into negotiations with the Kees in 2010. Over the course of several months, the parties met in person and by telephone to discuss the mining plan, the terms of the mitigation agreements, and the consideration that Williamson Energy would pay the Kees under the terms of the agreements. Once the parties were in agreement on the terms, Williamson Energy reduced the agreements to writing and the Kees were given five days to sign them or reject them.

¶ 120   Further, this lengthy negotiation process is evidence that the Kees did not lack bargaining power. The Kees, who were general partners in the Partnership at the time they signed the mitigation agreements and releases, rejected Williamson Energy's initial offer of consideration, resulting in Williamson Energy increasing the amount of consideration which included a $10,000 signing bonus for each of the Kees.

¶ 121                      b. Substantive Unconscionability

¶ 122   Substantive unconscionability involves the actual terms of the contract and examines the relative fairness of the obligations assumed under the agreement, asking whether the terms are so

one-sided as to oppress or unfairly surprise an innocent party; whether there is an overall imbalance in the obligations and rights imposed by the bargain; and whether there is a significant cost-price disparity. *Phoenix Insurance Co.*, 242 Ill. 2d at 75.

¶ 123 The Partnership contends that the mitigation agreements were substantively unconscionable because they hid the fact that Williamson Energy intended the agreements to bar all liability for damages to the subsurface and that the Kees did not knowingly bargain for relinquishment of their right to pursue recovery for subsurface damage. We decline the Partnership's invitation to speculate as to what the Kees knowingly bargained for when they signed the mitigation agreements where it points to no evidence in the record to support such speculation. Moreover, we previously rejected the argument that Williamson Energy hid its intentions regarding the subsurface. We similarly decline the Partnership's invitation to speculate as to whether the Kees were "duped" into deeding away an estate in realty via a document that does not appear to be a deed. Once again, the Partnership fails to direct this court to evidence in the record that the Kees testified they were "duped."

¶ 124 Finally, the Partnership maintains that the mitigation agreements are substantively unconscionable in their attempt to extend the agreements to "New Surface" property not yet acquired by the Kees. Although the Partnership contends that such terms would result in the Kees being surprised and oppressed by the one-sided nature of the document, it provides no cogent argument to support this contention. Assuming, *arguendo*, we were to find the mitigation agreements were "unfair," not every unfair agreement is substantively unconscionable. *Phoenix Insurance Co.*, 242 Ill. 2d at 75-76. To find a contract substantively unconscionable, the terms must be "so unfair that the court cannot enforce it consistent with the interests of justice." *Id*. at 60.

¶ 125   Reviewing the actual terms of the mitigation agreements and examining the relative fairness of the obligations assumed by both parties under the agreements, we do not find the terms to be so one-sided that they result in oppression or unfair surprise to the Kees. We also do not find an imbalance in the obligations and rights imposed on the parties by the bargain, nor do we find a significant cost-price disparity. On the facts presented, we reject the Partnership's argument that the mitigation agreements are unconscionable.

¶ 126                              6. Motions for Clarification and Reconsideration

¶ 127   The Partnership argues that the circuit court erred in denying its motions for clarification and reconsideration. The Partnership, however, fails to make an argument or cite legal authority in support of its argument that the trial court erred in rejecting its request for clarification as an improper request for an advisory opinion. Accordingly, the claim is waived. See *First National Bank of LaGrange*, 375 Ill. App. 3d at 207 ("Mere contentions, without argument or citation of authority, do not merit consideration on appeal and are waived.").

¶ 128   "The purpose of a motion to reconsider is to alert the court to newly discovered evidence, changes in the law, or errors in the court's application of previously existing law." *Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 16. Generally, a circuit court's decision to grant or deny a motion for reconsideration lies within its discretion and will not be reversed absent an abuse of that discretion. *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1078 (2007). However, where the motion was based solely on the circuit court's application or purported misapplication of existing law, rather than on new facts or legal theories not presented at trial, a reviewing court will apply a *de novo* review. *Nissan Motor Acceptance Corp.*, 2012 IL App (1st) 111296, ¶ 16.

¶ 129 Here, the Partnership's motion to reconsider purportedly was based on new facts; thus, we review the circuit court's denial for an abuse of discretion. In its motion, the Partnership stated that on September 14, 2023, the parties had conducted a deposition of Williamson Energy's designated corporate representative, Gary Schmitz, regarding issues related to the mitigation agreements and releases. However, later the same day, the circuit court issued its order granting summary judgment in favor of Williamson Energy. The Partnership alleged in its motion that Schmitz's deposition testimony negated an essential element of Williamson Energy's breach of contract claim, namely, that Williamson Energy performed under the terms of the contract.

¶ 130 "The essential elements of a breach of contract are: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) resultant injury to the plaintiff." *Batson v. Oak Tree, Ltd*., 2013 IL App (1st) 123071, ¶ 35. The Partnership alleged that although Williamson Energy had asserted that it performed under the terms of the mitigation agreements by compensating the Kees for damages caused to their properties by its mining activities, Schmitz's testimony revealed that Williamson Energy had not performed as the remaining surface land overlying the other 113 other parcels in the Pierce Deeds would require additional compensation to be paid for damages to those surface lands. Specifically, the Partnership maintains that Schmitz testified that if new property had been acquired within the mine plan, a new agreement would have been required for each property acquired.

¶ 131 Williamson Energy counters that the argument mischaracterizes Schmitz's testimony wherein simply he testified that Williamson Energy complied with the law. By statute, Williamson Energy must (1) repair damage to surface land to the extent technologically and economically feasible, and (2) repair or compensate for damage to structures and facilities. Williamson Energy further counters that while it often attempts to enter mitigation agreements before mining has

50

occurred to address these issues, there is no requirement that it obtain a mitigation agreement under law.

¶ 132   We find the Partnership's contention that Schmitz's deposition testimony provided new facts is without merit. First, the Partnership failed to identify any property for which Williamson Energy needed a mitigation agreement but did not attempt to enter one, or where it failed to repair surface lands or compensate for structures. Second, the Partnership fails to establish how Schmitz's deposition testimony negated an essential element of the breach of contract claim (*i.e.* that Williamson Energy performed under the terms of the contract). Accordingly, the circuit court did not err in denying the Partnership's motion to reconsider.

¶ 133                   7. Williamson Energy's Amended Counterclaim

¶ 134   The Partnership argues that the circuit court abused its discretion in allowing Williamson Energy to amend its counterclaim to add a claim against the individual partners because it was barred by section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2022)). Specifically, it asserts that Williamson Energy moved to amend its counterclaim after the underlying case had been resolved and after the vast majority of attorney fees had been incurred.

¶ 135   At the outset, we disagree that the underlying case was resolved at the time Williamson Energy moved to amend its counterclaim. "Generally, an appeal may be taken only after the circuit court has resolved all claims against all parties to a cause of action." *Ely v. Pivar*, 2018 IL App (1st) 170626, ¶ 30. However, where an action involves multiple claims for relief, Illinois Supreme Court Rule 304(a) allows for appeals of orders that dispose of one or more but fewer than all of the claims between the parties. *Paul H. Schwendener, Inc. v. Jupiter Electric Co.*, 358 Ill. App. 3d 65, 73 (2005).  Here, the Partnership sought and received a Rule 304(a) order from the circuit court finding that there was no just reason to delay an appeal on their claims. In the first appeal, this

51

court rejected the Partnership's proposed construction of the Pierce Deeds, thus, defeating all counts of their amended complaint. However, because Williamson Energy's counterclaim was still pending following the appeal, the Partnership's argument is without merit.

¶ 136   Pursuant to section 2-616(a) of the Code of Civil Procedure, amendments to pleadings may be allowed on "just and reasonable terms" at any time before final judgment to enable the plaintiff to sustain the claim brought in the suit. 735 ILCS 5/2-616(a) (West 2022). The general rule is that where a party seeks to amend a complaint, leave to amend is freely granted. *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 88. However, despite this liberal policy, a party's right to amend is not absolute. *Id.* In determining whether to allow an amendment to a pleading, a trial court considers the following factors: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). "To be entitled to an order granting leave to amend, a party must meet all four *Loyola* factors." *Devyn Corp.*, 2015 IL App (4th) 140819, ¶ 89.

¶ 137   A reviewing court will not disturb a trial court's grant or denial of a motion for leave to amend absent an abuse of discretion. *Id*. ¶ 88. However, a trial court's failure to exercise its discretion when it is required by law to do so may itself constitute an abuse of discretion, precluding deferential consideration on appeal. *Seymour*, 2015 IL 118432, ¶ 50. Here, the circuit court did not include in its written order the basis for granting Williamson Energy leave to file an amended counterclaim. In a later order resolving the Partnership's motion to dismiss the amended counterclaim, the circuit court listed the *Loyola* factors but offered no analysis before finding that

the ends of justice justified allowing Williamson Energy to file its amended counterclaim. Thus, we review this issue *de novo*. *People v. Newborn*, 379 Ill. App. 3d 240, 248 (2008).

¶ 138 The Partnership argues that Williamson Energy was not entitled to an amendment as all four *Loyola* factors were not met, contending, in a somewhat conclusory manner, that (1) the second amended counterclaim was not offered to cure a defective pleading, but, rather, merely to assert claims which Williamson Energy had omitted from its first two answers and initial counterclaim; (2) the partners were prejudiced as it made them personally liable; (3) Williamson Energy provided no justification for its delay in seeking to amend its counterclaim; and (4) Williamson Energy could have asserted the claims in its initial answer, in its first amended complaint, or in its original counterclaim.

¶ 139 First, Williamson Energy responds that because it could have pursued claims against the individual partners in a separate lawsuit or series of lawsuits, it would have been a waste of judicial resources, as well as the individual partners' resources, to engage in piecemeal litigation. Thus, it argues, the amended counterclaim sought to cure a defect by adding the individual partners. Second, Williamson Energy argues that because it could have sought its claims against the individual partners in piecemeal fashion, they suffered no prejudice as a result of the amended counterclaim. Third, it maintains the proposed amendment was timely where Williamson Energy sought to amend its counterclaim shortly after the case was remanded from this court. Williamson Energy further argues it had to engage in extensive discovery to uncover the basic facts about the Partnership to determine the identities of the various partners. Fourth, Williamson Energy acknowledges it could have included its counterclaim against some of the individual partners earlier, but it waited until it discovered the identity of all the partners. We find Williamson

Energy's arguments that all four *Loyola* factors were met to be compelling, and we further find Williamson Energy was entitled to amend its counterclaim to add the individual partners.

¶ 140                    8. The Partnership's Right to Trial

¶ 141   The Partnership posits it was denied a right to trial because Williamson Energy was not entitled to judgment as a matter of law. It further posits that the circuit court did not properly find there was no genuine issue of material fact and did not engage in fact finding but merely adopted the statement of facts submitted by Williamson Energy.

¶ 142   Before considering the merits of the Partnership's argument, we reiterate the rules pertaining to summary judgment proceedings. Summary judgment cannot be entered if there remains a genuine issue of material fact in the case. 735 ILCS 5/2-1005(c) (West 2022). A genuine issue of fact exists where the material relevant facts in the case are disputed, or where reasonable persons could draw different inferences and conclusions from the undisputed facts. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). A circuit court's decision to enter summary judgment is reviewed *de novo*. *Conrads v. Rush-Copley Medical Center, Inc.*, 2023 IL App (2d) 220455, ¶ 35. Under this standard, a reviewing court gives no deference to the circuit court's decision, but instead " 'consider[s] anew the pleadings, affidavits, depositions, admissions, and exhibits on file to determine whether the trial court's decision was correct.' " *Id.* (quoting *Jackson v. Graham*, 323 Ill. App. 3d 766, 779 (2001)).

¶ 143   To survive a motion for summary judgment, the moving party must present some evidentiary facts to support each element of its cause of action, which would arguably entitle it to a judgment. *Marquardt v. City of Des Plaines*, 2018 IL App (1st) 163186, ¶ 16. "A party opposing a motion for summary judgment cannot rest on its pleadings if the other side has supplied uncontradicted facts that would warrant judgment in its favor [citation], and unsupported

54

conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact [citation]." *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 20.

¶ 144   As it relates to Williamson Energy's counterclaim, recovery in a breach of contract action required them to plead and prove (1) the existence of a valid contract, (2) performance by them, (3) breach by the Partnership, and (4) injury to Williamson Energy. *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206 (2000). A valid contract requires an offer, acceptance, and consideration. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151 (2006); *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329 (1977).

¶ 145   After a thorough review of the record, we find that Williamson Energy's pleadings and supporting documents were sufficient to establish all of the elements of the cause of action. As to the first element, we find that a valid and enforceable contract existed between the parties in the form of the mitigation agreements and releases signed by the Kees which also bound the Partnership and individual partners. Regarding the second element, we find that Williamson Energy performed under the terms of the mitigation agreements and releases and satisfied all conditions precedent thereunder, including paying the Kees all amounts owed in connection with the mitigation agreements and releases. As to the third element, we find that the Partnership and the partners, including the Kees, breached the contract. As the circuit court correctly concluded, the mitigation agreements and releases waived all claims for subsidence damage arising from Williamson Energy's mining operations; yet, the Partnership and the partners nevertheless filed suit on claims they previously had waived. Finally, as to the fourth element, we find that Williamson Energy was injured when it had to expend a considerable amount of time, money, and resources defending the lawsuit.

55

¶ 146 Where Williamson Energy presented sufficient evidence via its pleadings and supporting documents to satisfy its initial burden in the summary judgment proceeding, the burden then shifted to the Partnership, as the nonmoving party, to establish that there were genuine issues of material fact and/or that Williamson Energy was not entitled to judgment as a matter of law.

¶ 147 Throughout its appeal, the Partnership relies on various purported factual disputes found within the record. We note that " '[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' " (Emphases in original.) *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). For an issue to be "genuine" in the context of genuine issues of material fact, there must be evidence to support the position of the nonmoving party. *Pekin Insurance Co. v. Adams*, 343 Ill. App. 3d 272, 275 (2003). "Material" in the context of genuine issues of material fact means "facts that might affect the outcome of the case under the applicable substantive law." *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 37.

¶ 148 The nonmoving party cannot rely solely upon its pleadings, nor can it rely on mere argument alone. *Hotze*, 229 Ill. App. 3d at 305. "[T]he party opposing summary judgment must produce some competent, *admissible* evidence which, if proved, would warrant entry of judgment for the opposing party." (Emphasis in original.) *Brown, Udell & Pomerantz, Ltd. v. Ryan*, 369 Ill. App. 3d 821, 824 (2006). "The suggestion that an issue of material fact exists, without supporting evidence, is insufficient to create one." *Sacramento Crushing Corp. v. Correct/All Sewer, Inc.*, 318 Ill. App. 3d 571, 575 (2000).

¶ 149 Here, we conclude that the Partnership failed to carry its burden. Rather than presenting competent, admissible evidence, the Partnership relied heavily on legal arguments regarding, for

56

example, standing, judicial estoppel, judicial admissions, and unconscionability. These legal arguments lack evidentiary support in the record to be considered genuine issues of material fact. Additionally, the Partnership's argument that Schmitz's deposition testimony provided new facts, supporting its request for reconsideration, bears no relevance to the Partnership's underlying claim that the Partnership and individual partners breached the mitigation agreements and releases and, thus, cannot be considered a genuine issue of material fact. The Partnership presented little more than legal arguments and bare conclusory statements that the mitigation agreements and releases signed by the Kees did not bind the Partnership. The Partnership's argument that the 1939 agreement was competent, admissible evidence of a factual dispute fails where its current interpretation of the 1939 agreement conflicts with the Partnership's verified pleadings, testimony, and partnership documents relied upon by the Partnership throughout the course of lengthy litigation. Accordingly, we conclude based on our review of the record that there was no evidence (1) of any genuine issue of material fact or (2) establishing that Williamson Energy was not entitled to judgment as a matter of law.

¶ 150                                B. Attorney Fees

¶ 151   The Partnership contends the circuit court abused its discretion in awarding $2,929,814.28 in attorney fees because the attorney fees clause was not binding on the Partnership or the individual partners; the circuit court erred in allowing nearly $1,398,000 in block-billed time and in rejecting their objections to the attorney fees.

¶ 152   Where a contract provides for the award of attorney fees, a circuit court may award a reasonable amount of fees. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2024 IL App (1st) 221319, ¶ 21. The determination to award attorney fees and what amount to award is left to the sound discretion of the circuit court and will not be disturbed absent an abuse

57

of discretion. *Id*. ¶ 23. An abuse of discretion occurs only where the circuit court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the circuit court. *People v. Thomas*, 2018 IL App (1st) 171238, ¶ 61. "Contractual provisions for attorney fees must be strictly construed, and the court must determine the intention of the parties with respect to the payment of attorney fees." *Jackson v. Hammer*, 274 Ill. App. 3d 59, 70 (1995).

¶ 153    The Partnership's first argument is that it was not listed as a "Party" in the mitigation agreements. The opening paragraph of the mitigation agreements explicitly stated that the agreement was "by and between" the Kees and Williamson Energy. Thus, the circuit court erred in awarding attorney fees where it bound the Partnership and its partners to the attorney fee clause without receiving any evidence that the Kees had the intent to bind either the Partnership or its members. It further argues that Williamson Energy could not have intended these documents to bind the Partnership and its partners since Williamson Energy admitted it was ignorant of the existence of the partnership when the documents were signed.

¶ 154    Williamson Energy correctly points out that this argument is merely a rehash of the Partnership's previous arguments that the acts of the Kees did not bind the Partnership or the individual partners. As we previously concluded, the Kees had authority to bind the Partnership when they signed the mitigation agreements and releases as the subject matter of the documents was essential in the furtherance of the Partnership's business, the Partnership's argument fails.

¶ 155                                    1. Block-Billed Time

¶ 156    The Partnership next argues the circuit court erred in allowing nearly $1,398,000 in block-billed time. The Partnership contends that the circuit court misapplied the law when it failed to apply the rule against block billing, which it argues was established in *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978 (1987). Contrary to the Partnership's contention, *Kaiser* did

58

not establish a strict rule prohibiting block billing nor is there any requirement that block-billed time must always be reduced to zero.

¶ 157   Rather, the *Kaiser* court determined that a petition for attorney fees "must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." *Id*. at 984. A party seeking attorney fees bears the burden of presenting sufficient evidence from which the circuit court can render a decision as to their reasonableness, and there must be more presented than a mere compilation of hours multiplied by a fixed hourly rate. *Id*. at 983-84. Thus, "it is incumbent upon the petitioner to present detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." *Id*. at 984. "Once presented with these facts, the trial court should consider a variety of additional factors such as the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation." *Id*. "A trial court has broad discretionary powers in awarding attorney fees and its discretion will not be reversed on review unless the court abused its discretion." *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 66 (2009).

¶ 158   Williamson Energy argues that the Partnership failed to present evidence to contest the reasonableness of Williamson Energy's invoices which detailed the rates and services it paid its attorneys to litigate over several years. Here, in its written order, the circuit court expressly applied the additional factors identified in *Kaiser*, finding that the attorneys representing Williamson Energy were highly skilled and clearly knowledgeable as to mineral law; that the case represented a significant and complex claim not  common in any Illinois venue; that the case was challenging,

59

involving more than 120 parcels and required an interpretation of deeds from the early 1900s and required an application of subsidence law in the context of contracts; that in addition to a potential monetary value in the realm of $900,000,000, the case involved a potential claim for injunctive relief, which might have resulted in the stoppage of on-going mining operations, and as such, the case was important not only to the parties, but potentially to the community as a whole; and that the matter required a high degree of responsibility as legal counsel on all sides had to manage this litigation. The circuit court also noted that the usual and customary charges and hourly rate had been substantially litigated by the parties. Williamson Energy had urged that counsel's hourly rate was reasonable for the sophistication of the matter and for counsel in this region, whereas the Partnership argued that while the rates might be reasonable in other geographic regions, they were not for southern Illinois. The Partnership specifically challenged the $850 per hour charged for time spent by attorney Glasser. Based on the evidence provided, the circuit court found that the hourly rates charged by the law firms were reasonable. The circuit court found that Williamson Energy had received a substantial benefit as it had prevailed on all significant issues at both the trial and appellate court levels. With regards to a reasonable connection between the fees sought and risk of underlying litigation, the circuit court accepted that the amount claimed by Williamson Energy was in the hundreds of millions of dollars range, and that there was a legitimate basis for that claim as injunctive relief could have closed an operating mine; thus, there was a reasonable connection between the fees paid and the risk of the claims asserted.

¶ 159   The circuit court specifically addressed the Partnership's objection that the bills submitted by Bailey and Glasser were vague in that they utilized block billing throughout. The Partnership urged the circuit court to reject the entire $1,747,029.49 of block billings or, in the alternative, reduce those billings by 50%. Instead, the circuit court reduced that portion of the requested

attorney fees by 20%. In doing so, the circuit court reasoned that the issue was whether the billings provided a basis for the court to determine the reasonableness of the fees being sought. The circuit court found that overall, when viewed in light of the documents generated and filed throughout the course of the litigation, the billing entries provided a sufficient basis to determine the reasonable of the fees. However, the circuit court concluded there were entries which were vague and had no correlated documents and found it was not the court's job to parse together the billings and the deliverables. Nor would the circuit court speculate as to what was done to justify all block-billed amounts. Therefore, the circuit court reduced the billings associated with attorneys (both associates and partners) and paralegals at Bailey and Glasser by 20% of the hours billed. The circuit court noted the reduction reflected the value of the service provided but took into consideration that the block-billed entries, and others as well, were vague and imprecise.

¶ 160   Here, the circuit court carefully considered the Partnership's claims related to block billing along with all of the relevant factors before determining to reduce the block-billed fees by 20% overall. We cannot conclude that the circuit court abused its discretion in its award of attorney fees.

¶ 161                     2. Other Objections to Attorney Fees

¶ 162   The Partnership first maintains the circuit court abused its discretion in rejecting its objection to unallowable travel time, contending its expert identified $56,287.50 of *per se* unreasonable travel expenses. The Partnership suggests that travel time should be capped at the time a local attorney to the venue would have billed. In support of its argument, the Partnership relies on *Losurdo Brothers v. Arkin Distributing Co.*, 125 Ill. App. 3d 267, 275-76 (1984), for the proposition that "any additional attorney fees incurred by [petitioner] due to travel time of his chosen attorney beyond that generally incurred by attorneys in the area of the court proceeding [is]

61

not a reasonable expense." At the hearing on Williamson Energy's motion for attorney fees, the circuit court rejected the Partnership's argument that while the rates might be reasonable in other geographic regions, they were not for southern Illinois.

¶ 163   Williamson Energy counters that the *Losurdo* court did not hold that travel expenses are always unreasonable; instead, the *Losurdo* court concluded that under the particular facts of the case which are not present here, the trial court's refusal to award attorney fees for travel time was not an abuse of discretion where the issues were not complex requiring an attorney with specialized skills to be employed outside the general area of where the lawsuit was filed. *Id*.

¶ 164   As previously noted, the circuit court found the litigation issues were complex and sophisticated, and the attorneys representing Williamson Energy were highly skilled in mineral law. Accordingly, we do not find *Losurdo* persuasive, nor do we find that the circuit court abused its discretion in rejecting the Partnership's objection.

¶ 165   The Partnership next maintains the circuit court erred in rejecting its objection to time spent on irrelevant projects totaling $46,003 in attorney fees.  It argues that after reviewing the invoices submitted by Williamson Energy's attorneys, its expert discovered that significant time was spent on tasks irrelevant to the case such as review and analysis of cases in which a nonparty was involved, work for defendants besides Williamson Energy, work on separate Inman/Mitchell cases, and researching the State Board of Elections website. Following an evidentiary hearing, and after considering the Partnership's argument that certain tasks were irrelevant, the circuit court rejected the argument, reasoning it could not conclude that any of the services complained of would have had no potential impact on the outcome of the litigation.

¶ 166   Williamson Energy responds that, given the circuit court's intimate familiarity with the complex issues in the case, the parties, and the attorneys, the circuit court acknowledged the

relevance of researching these issues: "It is relevant to learn about the judge and your opponents. It is relevant to consider other litigation in the venue, especially if assigned to the same judge." We do not find that the circuit court abused its discretion.

¶ 167   Finally, the Partnership maintains the circuit court erred in rejecting its objection to excessive billing rates. It contends that the approved billing rates as high as $850 per hour for partners and $550 per hour for associates were too high for the region and, therefore, were not usual or customary in the community as required by *Kaiser*, 164 Ill. App. 3d at 983-84. The Partnership's expert valued the overcharge in attorney fees to be $618,727.81 and sought to have them disallowed. Once again, the Partnership disregards the circuit court's analysis of the additional factors required by *Kaiser* and the ultimate determination that the litigation issues were complex and sophisticated, and the attorneys representing Williamson Energy were highly skilled in mineral law.

¶ 168   We note that while the circuit court declined the Partnership's request to reduce the hourly fee for the attorneys, the circuit court capped the paralegal time at $184.25 per hour instead of the $275 per hour that was charged for some of the paralegal time. We also note that the circuit court did not reject all of the Partnership's objections to the attorney fees. Based on the Partnership's objections, the circuit court reduced the rate of clerical billings by paralegals, omitted billings for clerical duties for general overhead, and omitted billings for duplicate entries. We find that the circuit court conducted a thorough and thoughtful analysis and properly exercised its discretion in awarding attorney fees. In sum, having kicked the snow loose at the top of the mountain, the Partnership cannot now be heard to complain about the avalanche at the bottom.

¶ 169                    III. CONCLUSION

¶ 170   Having carefully reviewed the entire record, we conclude there was no genuine issue of material fact that would preclude the circuit court's grant of summary judgment in favor of Williamson Energy's second amended counterclaim and find no error with the trial court's adjudication of the attorney fee award. For the foregoing reasons, we affirm the circuit court's judgment.

¶ 171   Affirmed.